### In re Nicholas J. FIORILLO Debtor.

### In re Tracy Krowel, Debtor.

Jonathan R. Goldsmith, Trustee in Bankruptcy of Nicholas J. Fiorillo and Joseph H. Baldiga, Trustee in Bankruptcy of Tracy Krowel, Plaintiffs

v.

David Massad, Marcello Mallegni, Commerce Bank and Trust Company, and LBM Financial, LLC., Defendants.

Bankruptcy Nos. 10–44179 MSH, 11–43854 MSH.

Adversary Nos. 12–4005, 12–4006.

United States Bankruptcy Court, D. Massachusetts, Central Division.

June 3, 2013.

---

---

88 Shrewsbury Street . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .156
249 Lincoln Street . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .156
49 Old Colony Drive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .156
Claims Derivative of Those of Ms. Krowel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .157
Counts III and IV: Breach of Contract and Implied Covenant of Good Faith
 and Fair Dealing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .157
Res Judicata . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .158
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .159

## Introduction

Before me are three motions filed by the defendants in these consolidated adversary proceedings [1] to dismiss the identical four-count complaints filed by Jonathan Goldsmith and Joseph Baldiga, the chapter 7 trustees (the "Bankruptcy Trustees") of the bankruptcy estates of debtors, Nicholas Fiorillo and his wife, Tracy Krowel, (sometimes collectively referred to as the Fiorillos) respectively. Mr. Goldsmith asserts against the defendants certain claims of Mr. Fiorillo's bankruptcy estate as well as claims held by Mr. Goldsmith as the assignee of the Shrewsbury Street Development Companies, Inc. ("SSDC"), the Fiorillo Family Trust (the "Family Trust") and the 49 Old Colony Drive Trust (the "Colony Trust"). Mr. Baldiga maintains that he too is the assignee of the Family Trust's and the Colony Trust's claims against the defendants and in his complaint he asserts those claims along with claims of Ms. Krowel's bankruptcy estate. The complaints allege in counts I and II that defendants Marcello Mallegni and David Massad violated § 1962(c) and (d) of

Title 18 of the U.S.Code, the Racketeering Influenced and Corrupt Organizations Act ("RICO") and in counts III and IV that all defendants breached certain contracts and the attendant duties of good faith and fair dealing implicit in them.[2] As discussed in more detail below, each motion raises common bases for dismissal: that the complaints fail to state claims under RICO, that the claims are time-barred, that the claims are barred by the doctrine of *res judicata* and that the bankruptcy court lacks subject matter jurisdiction under the *Rooker–Feldman* doctrine. In their joint response, the Bankruptcy Trustees concede that counts III and IV of the complaints against Commerce Bank and Trust Company and David Massad should be dismissed.

## Background

These adversary proceedings are the latest in a series of lawsuits brought by Mr. Fiorillo, Ms. Krowel and SSDC in the Massachusetts state courts and in the United States District Court for the District of Massachusetts against some or all of these defendants. These adversary pro-

---

1. Marcello Mallegni and LBM Financial, LLC filed a joint motion.

2. The complaints are the first indication that claims of third parties had been assigned to the Bankruptcy Trustees. The terms of the assignments, including the division of proceeds, if any, between the two estates, are not known. Although claims under the racketeering statute are assignable, *Nat'l Asbestos Workers Medical Fund v. Philip Morris, Inc.,* 74 F.Supp.2d 221, 228 (E.D.N.Y.1999), and cases cited therein, if the Bankruptcy Trustees transferred property of the bankruptcy estates

in exchange for the assignments, then the assignments are not valid absent court approval which has not been obtained. 11 U.S.C. § 363(b). Taking judicial notice of the debtors' schedules of assets and liabilities and statements of financial affairs filed in support of their bankruptcy petitions, I note that neither debtor has listed any interests in either the Family Trust or the Colony Trust. Mr. Fiorillo listed what he describes as an "unknown ownership interest" in SSDC on his schedule B. Ms. Krowel does not disclose any interest in SSDC.

ceedings also follow an action or actions brought in state court against Ms. Krowel by a third party, Santo Arcuri, whose judgment against Ms. Krowel in at least one of the lawsuits plays a significant role in the complex web of dealings described below.[3] The state and federal court lawsuits, all of which have been dismissed or settled (or in the case of one of the actions brought by Mr. Arcuri, in which final orders have entered), involve many of the same properties and facts upon which the Bankruptcy Trustees base their claims in these adversary proceedings. The Bankruptcy Trustees contend that at least some of the prior lawsuits were resolved as a result of ongoing racketeering activities.

**Facts**

The facts are drawn from the complaints filed in the adversary proceedings, the exhibits to the motions to dismiss and to the Bankruptcy Trustees' joint response. All of the exhibits were incorporated by reference in the complaint or are public records. I have also taken judicial notice of the dockets and pleadings filed in the debtors' and SSDC's previous bankruptcy cases (which are detailed below) in order to present a more complete picture of the parties and properties at issue in these adversary proceedings.

Defendant, Marcello Mallegni, is the manager of and a substantial shareholder in defendant, LBM Financial, LLC ("LBM"). Defendant, David Massad, is the chairman of defendant, Commerce Bank, and also holds an interest in LBM. The complaints allege that Messrs. Mallegni and Massad controlled a racketeering enterprise through an association-in-fact composed of all of the defendants and two non-defendants, Michael Norris and Pamela Massad, who are attorneys who represented the defendants in some of the transactions at issue in these adversary proceedings.[4] Messrs. Massad and Mallegni are alleged to have promised loans to the Fiorillos or SSDC, a company formed by Mr. Fiorillo in March 2005, and owned, at least in part, by Mr. Fiorillo and of which he is the president, on terms that never materialized. The Bankruptcy Trustees allege that Messrs. Massad and Mallegni coerced the Fiorillos and SSDC into accepting loans on usurious terms, forced the Fiorillos, SSDC and the Family Trust to repay debts which they did not owe and used threats of violence and loss of property to extort money and other property from Mr. Fiorillo, Ms. Krowel, SSDC, the Family Trust and the Colony Trust.

The transactions of which the Bankruptcy Trustees complain were primarily among Mr. Fiorillo, a commercial real estate developer, on the one hand and the defendants on the other.[5] The allegations

---

3. As discussed below, one of the lawsuits brought by Mr. Arcuri was filed against both Ms. Krowel and Mr. Fiorillo in or around January 2011 to obtain a lien on the Fiorillos' current family residence. Complaints at ¶ 84.

4. Complaints at ¶¶ 4, 104 and 106–07.

5. The Bankruptcy Trustees allege that Ms. Krowel was not involved in commercial real estate development. Complaints at ¶ 18. That allegation is inconsistent with allegations made by Mr. Fiorillo, Ms. Krowel and others in an amended complaint (the "USDC Amended Complaint") filed by them in federal district court C.A. 07–40015–FDS (the "USDC Action") discussed in greater detail later in this memorandum. *See, e.g.,* ¶ 218 of the USDC Amended Complaint, a copy of which is attached as Exhibit E to the memorandum of Mr. Massad in support of his motion to dismiss. ("By in or around July 2004, Fiorillo and Krowel were heavily involved in several commercial real estate ventures and were seeking financing or refinancing through entities in which Massad had an interest or controlled. . . .").

indicate that the transactions generally followed a common pattern: (i) Mr. Fiorillo, seeking to finance a real estate investment, was promised a loan on terms that were more favorable than those actually presented at the loan closing; (ii) if he complained, he was threatened with the loss of funding for the loan, with the attendant risk of losing a deposit or being sued by a seller, and possible foreclosure of other properties financed with the defendants; and (iii) repayment of the loans was virtually impossible as the payoff amounts provided by the defendants often exceeded significantly what was owed according to the loan documents thereby creating loan to value ratios that would not permit conventional refinancing. In some instances it was alleged that the defendants and/or their affiliates received ownership interests in the real estate as a condition for making a loan or as repayment for a debt that was not owed. In other instances property was acquired in what are alleged to be illegal foreclosures.

Specifically the Bankruptcy Trustees seek damages for injuries they allege arose from racketeering activities related to six properties, five of which are located in Worcester, Massachusetts and one of which, the current Fiorillo family residence, is located in Shrewsbury, Massachusetts. The Worcester properties are at 23 A, B, C, and D North Quinsigamond Avenue, 425B Salisbury Street, 157 Shrewsbury Street, 88 Shrewsbury Street and 249 Lincoln Street. The Shrewsbury property is at 49 Old Colony Drive.[6] They allege that as a result of threats of harm by Mr. Massad and Mr. Mallegni, in October 2006 Mr. Fiorillo was coerced into an unfavorable settlement of certain state court actions involving Mr. Fiorillo, Ms. Krowel, SSDC and certain of the defendants and that in 2010 Mr. Fiorillo and Ms. Krowel were coerced into dismissing an action filed in federal court (the USDC Action) under similar threats of harm. The Bankruptcy Trustees also allege breach of contract and breach of fiduciary duties by Mr. Mallegni and LBM in connection with the properties at 157 Shrewsbury Street, 88 Shrewsbury Street and 249 Lincoln Street. They consent to the dismissal of the contract claims against Mr. Massad and Commerce Bank.

The factual recitations in the Bankruptcy Trustees' complaints are organized around individual properties. The motions to dismiss and the joint response follow the same approach. I adopt this format for the purposes of this memorandum but have reordered the presentation of the properties in an effort to give some sense of the chronology of events. While the facts presented are mere allegations by the Bankruptcy Trustees, for purposes of the motions to dismiss I must assume they are true except in instances where an alleged fact has been conclusively contradicted by the plaintiffs' concessions or otherwise.

### The Properties

### 23 A, B, C and D North Quinsigamond Avenue[7]

In or about 1997, Commerce Bank loaned Mr. Fiorillo money to purchase four homes located at 23 A, B, C and D North Quinsigamond Avenue in Worcester (the "Quinsigamond Avenue property"). Mr. Fiorillo made a down payment of approximately $10,000 and obtained a multi-year loan from Commerce Bank for approximately $207,000 at an annual interest rate of 8% secured by a mortgage on the prop-

---

6. This property is also referred to as "Olde" Colony Drive.

7. Allegations relating to this property appear in the complaints at ¶¶ 87–93.

erty.[8] When Mr. Fiorillo purchased the Quinsigamond Avenue property, it generated approximately $5,000 a month in rental income.

In 1999, Mr. Massad and an associate, Freddie Carrozza, summoned Mr. Fiorillo to a meeting outside Commerce Bank. Messrs. Massad and Carrozza complained to Mr. Fiorillo that a joint venture they were all involved in was not as profitable as expected and demanded that Mr. Fiorillo pay them $150,000 as compensation and interest relating to that venture. During the meeting Mr. Massad warned Mr. Fiorillo: "Do the right thing. You don't want to embarrass me and end up getting yourself hurt." Mr. Fiorillo was intimidated and deeded the Quinsigamond Avenue property to an unidentified associate of Mr. Massad's as payment of the $150,000.

Although Mr. Fiorillo deeded the Quinsigamond Avenue property to Mr. Massad's associate in 1999 and thereafter Mr. Massad and/or his associate controlled the property and collected the rents, Mr. Massad prevented the Commerce Bank mortgage on the Quinsigamond Avenue property from being discharged until November 2008. Mr. Massad also caused the property to be encumbered with additional mortgages securing $500,000 in debt. The complaints do not state when these additional encumbrances were added. Mr. Massad directed his associate (which I understand to be the party to whom Mr.

Fiorillo deeded the property) not to make the mortgage payments timely, all in an effort to damage Mr. Fiorillo's credit rating to the point where he would be unable to borrow money from a conventional lender.

### 425B Salisbury Street[9]

In or about May 2003, Mr. Fiorillo and Ms. Krowell bought a single family house located at 425B Salisbury Street in Worcester (the "Salisbury Street property") to be used as their family residence. They made a $50,000 cash down payment and financed the balance of the purchase price with a loan from Entrust Financial, an entity owned and operated by Mr. Massad and an unidentified associate. The following year, in or about May 2004, Mr. Massad threatened to foreclose on other of Mr. Fiorillo's properties [10] unless Mr. Fiorillo and Ms. Krowel refinanced the Entrust Financial loan with a loan or loans from Commerce Bank at a promised interest rate of 5.5% interest per annum. When Mr. Fiorillo and Ms. Krowel arrived for the closing in November 2005,[11] however, the terms had changed. Fearing foreclosures of other properties if the refinancing did not occur, Mr. Fiorillo and Ms. Krowel agreed to two loans: one in the amount of $330,700 secured by a five year adjustable rate mortgage with a potential interest rate as high as 11.5% per annum and a home equity line of credit for $216,000. Mr. Fiorillo and Ms. Krowel were required to take out the home equity line of credit

8. As they do with the allegations relating to the other properties, the complaints simply refer to the transactions as "mortgages," which I understand to mean that the borrower signed a promissory note secured by a mortgage on the relevant property. With respect to the Quinsigamond Avenue property, it is unclear whether there was a single mortgage or four separate mortgages.

9. Allegations relating to this property appear in the complaints at ¶¶ 69–80.

10. The complaints do not state what other properties Mr. Fiorillo owned that were financed with the defendants in May 2004 although it appears he still owned the Airline Lewis Building (discussed later) which he acquired in 2002. USDC Amended Complaint at ¶¶ 47–51.

11. It is unclear why there was an eighteen month delay between the demand and the effective date of the refinancing.

in order to write a $35,000 check to Mr. Massad as repayment of a debt they did not owe him.[12]

In or about November 2005, Mr. Mallegni coerced Mr. Fiorillo and Ms. Krowel to secure their obligation on a $1,010,000 loan from LBM for an unrelated project by granting LBM a second mortgage on the Salisbury Street property. By the summer of 2006, Mr. Fiorillo had repaid the LBM loan secured by the second mortgage but Mr. Mallegni and LBM never discharged the mortgage and used threats of foreclosure of this mortgage to extort further concessions from Mr. Fiorillo and Ms. Krowel, including the settlement of various state and federal lawsuits on unfavorable terms.

In February 2006, Messrs. Massad and Mallegni and others, including Frederick Carozza,[13] described in the complaints as an individual with a reputation for violence, summoned Mr. Fiorillo to a meeting in order to discuss their various real estate dealings, which by this time included not only the Salisbury Street property but properties located at 157 Shrewsbury Street and 88 Shrewsbury Street.[14] During the meeting Mr. Massad demanded that as a condition to his continuing to do business with Mr. Fiorillo, Mr. Fiorillo convey to him the property located at 267 Shrewsbury Street, Worcester, Massachusetts, known as the Airline Lewis Building upon which either Mr. Massad or Commerce Bank held a mortgage,[15] and threatened Mr. Fiorillo with bodily harm if he failed to do so. Mr. Fiorillo refused to transfer the Airline Lewis Building to Mr. Massad.

Sometime around the date of this meeting, there was published an unflattering newspaper or magazine article focusing on Mr. Massad's business practices.[16] Mr. Massad telephoned Mr. Fiorillo and threatened him with bodily harm or death and also threatened to foreclose on the Salisbury Street property if Mr. Massad's name appeared in print again and if Mr. Fiorillo continued to refuse to convey the Airline Lewis Building.

In or about May 2006, in retaliation for Mr. Fiorillo's refusing to give him the Airline Lewis Building, Mr. Massad caused Mr. Norris to issue to Mr. Fiorillo and Ms. Krowel and related entities several notices of foreclosure regarding various properties, including the Salisbury Street proper-

12. The USDC Amended Complaint alleged that at the closing of the loan on 425B Salisbury Street, Ms. Krowel was instructed by Pamela Massad, the closing attorney, to write "Kevin McManus loan repayment" on the memo line of the $35,000 check made payable to Mr. Massad personally. USDC Amended Complaint at ¶ 224.

13. I assume Frederick Carozza was the same individual identified as Freddie Carrozza who was present at the 1999 meeting regarding the Quinsigamond Avenue property discussed previously.

14. The allegations relating to this meeting appear in ¶ 37 of the complaints. The meeting is also described in somewhat greater detail in ¶ 61 of the USDC Amended Complaint.

15. The Bankruptcy Trustees contend that they are not seeking damages relating to the Airline Lewis Building. The Airline Lewis Building was one of the subjects of the USDC Action filed by Mr. Fiorillo Ms. Krowel and SSDC against Messrs. Massad and Mallegni, LBM and Commerce Bank, among others. *See* USDC Amended Complaint. It was also the subject of a state court complaint brought by Mr. Fiorillo and SSDC discussed later in this memorandum.

16. The USDC Amended Complaint alleged that the article detailing various legal battles between Mr. Fiorillo and Mr. Massad was published in Worcester Magazine on July 5, 2006. On July 6, 2006, Mr. Massad placed the threatening call to Mr. Fiorillo. USDC Amended Complaint at ¶¶ 239 and 240.

ty.[17] At the time the foreclosure notices were issued, Mr. Fiorillo and Ms. Krowel were current on the notes relating to the Salisbury Street property.

In March 2007, Mr. Fiorillo and Ms. Krowel transferred title to the Salisbury Street property to Frank Fiorillo, Mr. Fiorillo's father, who then refinanced the loans secured by that property with loans from a bank unrelated to the defendants. To accomplish the refinancing, Mr. Fiorillo, Ms. Krowel and Frank Fiorillo paid Mr. Massad or Commerce Bank $589,000 even though only $545,000 was owed on the loans.[18] The complaint does not state the date on which these payments were made. The payment of the additional amount resulted in an effective interest rate of 23% per annum.

In December 2008, Frank Fiorillo transferred the Salisbury Street property to the Family Trust of which Frank Fiorillo was the trustee and the children of Mr. Fiorillo and Ms. Krowel were the beneficiaries.

At about the same time, in retaliation for Mr. Fiorillo's refusal to convey the Airline Lewis Building to Mr. Massad and as a way to force Mr. Fiorillo to settle the USDC Action brought by Mr. Fiorillo, Ms. Krowel and others, Mr. Massad caused Santo Arcuri, identified as an associate of Mr. Massad, to file an action against Mr. Fiorillo[19] in which Mr. Arcuri obtained a temporary restraining order preventing any transfer or disposition of the Salisbury Street property. In Mr. Arcuri's state court lawsuit he claimed he was owed $200,000 on a loan incurred in connection with property at 157 Shrewsbury Street (see below). Mr. Fiorillo maintained that he had satisfied that obligation by conveying to Mr. Arcuri an interest in an Italian restaurant.[20] As a result of the TRO, the Family Trust could not sell the Salisbury Street property in 2009 for a $200,000 profit as the Bankruptcy Trustees suggest would have happened but instead ultimately sold the property at a loss.

The Salisbury Street property was one of the subjects of the USDC Action brought in 2007 by Mr. Fiorillo, Ms. Krowel and SSDC, among others, against the defendants in this adversary proceeding and others. The allegations in the USDC Action, although set forth in greater detail in the USDC Amended Complaint, are the same as many of those raised in these adversary proceedings.[21] Mr. Fiorillo and Ms. Krowel voluntarily dismissed that action without prejudice, although under threats of violence and economic harm ac-

17. According to the USDC Amended Complaint on May 3, 2006, Ms. Massad, on behalf of Gamewell Realty, Inc., which held the mortgage on the Airline Lewis Building, sent Mr. Fiorillo a notice of acceleration of the Airline Lewis Building note and a demand for its payment. *See* USDC Amended Complaint at ¶ 62.

18. The complaints are unclear as to who received payment.

19. The complaints allege that Mr. Massad directed Mr. Arcuri to file the state court litigation against Mr. Fiorillo "[i]n or about the end of 2008." Complaints at ¶ 77. This litigation against Mr. Fiorillo appears to be in addition to and different from the state court lawsuit filed by Mr. Arcuri against Ms. Krowel in 2006. Copies of pleadings from Mr. Arcuri's action against Ms. Krowel are attached as Exhibits D–F and H to the memorandum of LBM and Mr. Mallegni in support of their motion to dismiss.

20. As noted in the following section, Mr. Fiorillo purchased 157 Shrewsbury Street from Mr. Arcuri. The property included an Italian restaurant, Piccolo's Italian Restaurant, which may be the restaurant transferred to Mr. Arcuri. *See* USDC Amended complaint at ¶ 159.

21. USDC Amended Complaint at ¶¶ 216–231.

cording to the Bankruptcy Trustees.[22]

### 157 Shrewsbury Street[23]

In or about February 2004, Mr. Fiorillo again approached Mr. Massad for a loan, this time to purchase commercial property located at 157 Shrewsbury Street in Worcester from Santo Arcuri for a purchase price of $520,000. Mr. Massad agreed that Commerce Bank would lend Mr. Fiorillo $520,000 at 7% interest per annum payable in three years. Mr. Fiorillo was required to pay $50,000, presumably to Mr. Arcuri, as a down payment. At the closing which took place on or about June 7, 2004, however, Mr. Fiorillo was presented with a one year mortgage loan, not from Commerce Bank, but from LBM in the amount of $360,000 at an annual interest rate of 14% plus four points and an interest reserve. The balance of the purchase price was to be obtained by a loan from Mr. Arcuri.[24] Mr. Fiorillo accepted the terms so as not to lose his $50,000 down payment.[25]

In or around October 2004, Mr. Fiorillo attempted to refinance the LBM loan with a $400,000, five year, 6.75% loan from Webster First Federal Credit Union. At this time the outstanding principal balance on the LBM note was $360,000 but Messrs. Massad and Mallegni, through Attorney Norris, demanded $495,000 as repayment for the outstanding note, considerably more than the note required. In January 2005, Mr. Fiorillo apparently went ahead and refinanced the LBM note with a loan from the credit union. Because he needed an additional $95,000 to satisfy LBM's inflated payoff demand in order to proceed with the refinancing, Mr. Fiorillo borrowed $95,000, for a term of one year at an interest rate of 14% from Mr. Mallegni and granted Mr. Mallegni a junior mortgage on the property.

As noted above, in February 2006, Messrs. Massad, Mallegni and Carrozza met with Mr. Fiorillo to discuss their business dealings. It was at this meeting that Messrs. Massad and Mallegni demanded that Mr. Fiorillo transfer the Airline Lewis Building to Mr. Massad and as a result of Mr. Fiorillo's refusal to do so, Mr. Massad retaliated. As he did with the Salisbury Street property, in or about May 2006, Mr. Massad caused Mr. Norris to send Mr. Fiorillo a notice of foreclosure of Mr. Mallegni's junior mortgage on the 157 Shrewsbury Street property. When the foreclosure notice was sent to Mr. Fiorillo, he owed no more than $135,000 on the note to Mr. Mallegni although repayment of $178,000 was demanded.

Mr. Fiorillo commenced suit in the state court against Messrs. Massad and Mallegni to enjoin the foreclosure of this and other properties, including 88 Shrewsbury

---

22. *See* Memorandum and Order on Plaintiffs' Motion to Dismiss attached as Exhibit F to the Massad Memorandum.

23. Allegations relating to this property appear in the complaints at ¶¶ 29–41.

24. This is the second mortgage debt which the Bankruptcy Trustees allege was repaid by Mr. Fiorillo's transferring his interest in a restaurant to Mr. Arcuri but which Mr. Arcuri claimed in his state court action was still due and owing.

25. The Bankruptcy Trustees' complaints do not allege that Ms. Krowel or SSDC had an interest in this property but in a complaint filed in Worcester Superior Court, CA 06–1149, and verified by Ms. Krowel and Mr. Fiorillo as president of SSDC, a copy of which is attached as Exhibit A to the memorandum of Mr. Mallegni and LBM, it is alleged that at the closing of the loan transaction for 249 Lincoln Street, discussed below, LBM demanded that Ms. Krowel and Mr. Fiorillo transfer a 25% in the 157 Shrewsbury Street property to Mr. Mallegni.

Street.[26] Fearing for his and his family's safety and to avoid continuing economic duress, Mr. Fiorillo ultimately settled the litigation in October 2006 by, among other things, paying Mr. Mallegni $156,000 in exchange for Mr. Mallegni's terminating the foreclosure on the 157 Shrewsbury Street property.

The 157 Shrewsbury Street property was also the subject of the USDC Action. The allegations in the USDC Amended Complaint are virtually identical to those asserted in these adversary proceedings.[27] As I have previously noted, Mr. Fiorillo and Ms. Krowel voluntarily dismissed that action without prejudice, although under threats of violence and economic harm according to the Bankruptcy Trustees.

### 88 Shrewsbury Street[28]

In late 2004, SSDC and/or Mr. Fiorillo [29] agreed to purchase commercial property located at 88 Shrewsbury Street in Worcester for $601,000. In or about December 2004, SSDC and/or Mr. Fiorillo sought financing for this purchase from Mr. Mallegni who agreed to have LBM lend $650,000 at 12% interest plus two points. When Mr. Fiorillo appeared for the closing, however, he was presented with two loans totaling $800,750, with $601,000 bearing interest at 12% per annum and the balance bearing interest at 6.25%. The money in excess of the purchase price was to be used to fund an interest reserve and for capital improvements. Mr. Mallegni also demanded and received for himself and Attorney Norris a 55% ownership interest in the property as a condition to closing the loan. Mr. Fiorillo closed this transaction for fear of being sued by the seller for specific performance and of losing the down payment.

Following the closing, Mr. Mallegni assumed control of the finances for this property and misappropriated rents generated by the property as well as $150,000 of the money that was to be used for capital improvements, causing Mr. Fiorillo to use $7,000 of his own money for renovations.

As noted above, during the February 2006 meeting to discuss the parties' various real estate dealings at which Messrs. Fiorillo, Massad, Mallegni and Carrozza were present, Mr. Massad demanded that Mr. Fiorillo transfer the Airline Lewis Building to him. As he did with the Salisbury Street and 157 Shrewsbury Street properties, in retaliation for Mr. Fiorillo's refusal to transfer the Airline Lewis Building, in or about May 2006, Mr. Mallegni caused LBM to send a notice of foreclosure with respect to the 88 Shrewsbury Street property to Mr. Fiorillo and/or SSDC asserting that the loan was in default and that Mr. Fiorillo and/or SSDC owed LBM in excess of $800,000, although the amount actually owed should have been approximately $615,000.

Mr. Fiorillo sued Messrs. Massad and Mallegni in state court to stop the foreclo-

---

**26.** The Bankruptcy Trustees allege that Mr. Fiorillo commenced state court litigation to stop the foreclosures of this and other properties. Attached as Exhibit B to Mr. Mallegni and LBM's memorandum is a copy of the state court complaint, CA 06–1311, verified by Mr. Fiorillo and SSDC, brought against Gamewell Realty, Inc., Mr. Mallegni and Mr. Massad. That complaint deals only with the property 267 Shrewsbury Street, the Airline Lewis Building. I have not been provided with a copy of any complaint or complaints

Mr. Fiorillo may have brought to stop the foreclosures that were the subjects of the May 2006 foreclosure notices.

**27.** USDC Amended Complaint at ¶¶ 159–169.

**28.** Allegations relating to this property appear in the complaints at ¶¶ 54–68.

**29.** The complaints refer to the buyer and borrower in this transaction as "SSDC/Fiorillo."

sure on this and other properties and then settled the state court litigation in October 2006. As part of the settlement Mr. Fiorillo and/or SSDC deeded their remaining 45% interest in the 88 Shrewsbury Street property to Mr. Mallegni who, with Mr. Norris, already owned 55%.[30]

The property at 88 Shrewsbury Street was also among the subjects of the USDC Action that was voluntarily dismissed by the Fiorillos. The allegations in the USDC Amended Complaint, although set forth in greater detail, are similar to those raised in these adversary proceedings.[31]

## 249 Lincoln Street[32]

In or about April 2005, Mr. Fiorillo again sought financing from Mr. Mallegni, this time to buy a mixed use residential and commercial building located at 249 Lincoln Street in Worcester for $550,000. At the time of the purchase, the property generated rental income of approximately $109,000 per year. Mr. Fiorillo made a $20,000 payment, part of which was used for the down payment on the property with the balance used for associated expenses. Mr. Mallegni agreed that LBM would loan him $550,000 at 12% annual interest plus three points but when Mr. Fiorillo appeared for the closing on May 3, 2005, he was presented with different terms, namely a one year term note at 14% annual interest with three points and the requirement that Mr. Fiorillo assign to Mr. Mallegni a 25% interest in the 157 Shrewsbury Street property discussed previously. When Mr. Fiorillo telephoned Mr. Mallegni to complain about the new loan terms, Mr. Mallegni threatened to stop funding for the loan and to have Mr. Massad foreclose on the Airline Lewis Building as well as on Mr. Fiorillo's residence.[33] Mr. Fiorillo closed on the loan on the new terms and began investing his own money into renovating the building.

In or about November 2005, Mr. Fiorillo requested a payoff figure from LBM in order to refinance the outstanding loan. Although the payoff figure should have been approximately $554,000, Mr. Mallegni stated it was $648,758.48 thus making Mr. Fiorillo's refinancing effort impossible.

By May 2006, when the outstanding balance of the loan should have been approximately $603,000, Mr. Mallegni claimed the outstanding balance owed LBM was $871,000 and caused Mr. Norris to send a notice of foreclosure for this property along with the notices of foreclosure on other properties financed by him or LBM. As with the other properties which were the subject of impending foreclosures, Mr. Fiorillo included the 249 Lincoln Street property in his state court litigation in an effort to stop the foreclosure.[34] As part of the October 2006 settlement of the state

---

**30.** According to the Amended Complaint, the purchaser of 88 Shrewsbury Street was Shrewsbury Street Investment LLC ("SSI"), an entity formed to acquire title to the property. SSI was owned by Mr. Fiorillo (45%) with the remaining 55% owned by Mr. Mallegni and Attorney Norris. Mr. Mallegni was the manager of SSI. Mr. Fiorillo guaranteed its obligations.

**31.** USDC Court Amended Complaint at ¶¶ 141–147.

**32.** Allegations relating to this property appear in the complaints at ¶¶ 42–53.

**33.** According to the USDC Amended Complaint the note and mortgage on the Airline Lewis Building were held by Gamewell Realty, Inc., an affiliate of Mr. Massad. *See* USDC Amended Complaint at ¶ 51

**34.** It is unclear whether Mr. Fiorillo commenced a state court action on his own behalf to halt the foreclosure of if the reference to Mr. Fiorillo's lawsuit refers to the action filed by Ms. Krowel and SSDC.

court litigation, LBM was permitted to foreclose its mortgage on this property.

Ms. Krowell and SSDC also commenced a state court action in the Worcester Superior Court (CA # 06–1149) to stop the foreclosure of the Lincoln Street property.[35] According to the state court complaint, SSDC was the record owner of 249 Lincoln Street. The case was dismissed with prejudice by stipulation of the parties dated November 9, 2006 in accordance with the October 2006 settlement.

The 249 Lincoln Street property was also at issue in the USDC Action which the Fiorillos dismissed without prejudice. The allegations in the USDC Amended Complaint, although set forth in greater detail, are similar to those raised in these adversary proceedings.[36]

### 49 Old Colony Drive[37]

On May 26, 2009, the Fiorillos caused the Colony Trust by its then trustee, Erik Krowel, to purchase for the Fiorillo family a new home located at 49 Old Colony Drive in Shrewsbury. The beneficiaries of the Colony Trust are the children of Mr. Fiorillo and Ms. Krowel. The purchase price of the home was $389,000 and purchase money financing was provided by a lender unrelated to the defendants. The note was for a one year term and bore interest at 12% per annum plus three points. In what appears to be a different state court lawsuit from the one in which he obtained a temporary restraining order or preliminary injunction on the Fiorillos' prior residence at 425B Salisbury Street, Mr. Arcuri obtained a lien on the 49 Old Colony Drive property based on the 157 Shrewsbury Street loan that was no longer outstanding.[38] As a result, the Colony Trust was forced to obtain an extension of the one year note at a cost of approximately $75,000 in additional points and interest.

This property was acquired after the commencement of the USDC Action.

### The Prior State and Federal Court Lawsuits

On June 1, 2006, Ms. Krowel and SSDC filed an action against LBM in the Worcester Superior Court (C.A. # 06–1149) seeking to enjoin the foreclosure of 249 Lincoln Street.[39] Pursuant to a settlement agreement dated October 13, 2006, among Ms. Krowel, SSDC, Mr. Fiorillo, Mr. Mallegni and LBM, that action was dismissed with prejudice by the parties on November 15, 2006.[40]

---

**35.** *See* complaint filed by Ms. Krowell and SSDC against LBM in the Worcester Superior Court, CA # 06–1149, a copy of which is attached as Exhibit A to the Memorandum of LBM and Mr. Mallegni in support of their motion to dismiss. *See also* USDC Amended Complaint at ¶ 232.

**36.** USDC Amended Complaint at ¶¶ 97–106. According to the Amended Complaint, the parties to the transaction had an agreement whereby Mr. Mallegni, although a 25% owner of the property, was not responsible for any costs or expenses related to the property.

**37.** Allegations relating to this property appear in the complaints at ¶¶ 81–86.

**38.** The Bankruptcy Trustees allege that around the end of 2008, Mr. Massad directed

Mr. Arcuri to obtain a preliminary injunction or temporary restraining order apparently prohibiting the transfer of Mr. Fiorillo and Ms. Krowel' former residence at 425B Salisbury Street. They allege that, with respect to the 49 Old Colony Drive property, on or about January 2011, Mr. Massad directed Mr. Arcuri to file "a sham lawsuit" to obtain a lien against the Old Colony drive property.

**39.** *See* exhibit A to the memorandum of Mr. Mallegni and LBM.

**40.** A copy of the Confidential Settlement and Release Agreement is attached as Exhibit 2 to the Bankruptcy Trustees' joint opposition to the motions to dismiss.

On June 21, 2006, Mr. Fiorillo and SSDC filed an action against Gamewell Realty, Inc. and Messrs. Massad and Mallegni in Worcester Superior Court (C.A.# 06–1311) seeking to enjoin the foreclosure of the Airline Lewis Building. The complaint alleged that threats of no future funding were made to coerce Mr. Fiorillo and SSDC into paying usurious and illegal amounts with respect to a loan secured by a mortgage on the Airline Lewis building.[41] The case was dismissed with prejudice as to Mr. Mallegni on November 15, 2006 pursuant to the October 13, 2006 settlement agreement. On January 14, 2008 the state court granted Mr. Massad's summary judgment motion.[42] This lawsuit appears to be the state court lawsuit referred to in the USDC Action as having been on appeal when Judge Saylor in the USDC Action issued his April 9, 2008 order denying the motions to dismiss filed by certain of the USDC Action defendants.[43]

On June 9, 2009, in *Arcuri v. Krowel,* filed in the Worcester Superior Court (C.A.# 06–00838), Santo Arcuri obtained a judgment against Ms. Krowel in the amount of $156,306.39 plus interest of $58,891.62. On March 2, 2010, Mr. Arcuri, presumably asserting some sort of judgment lien, obtained an order from the Worcester Superior Court, effective on April 21, 2010, for an auctioneer to auction Ms. Krowel's rights in and to the USDC Action. On April 4, 2010, Ms. Krowel attempted to convey her interests in the USDC Action to Mr. Fiorillo but the auction proceeded and Mr. Arcuri was the high bidder. On June 30, 2010, the state court issued an order confirming that Mr. Arcuri, not Mr. Fiorillo, owned Ms. Krowel's rights in the USDC Action. Those claims were then apparently further assigned by Mr. Arcuri to LBM which caused all of Ms. Krowel's claims in the USDC Action to be dismissed on August 17, 2010.

In addition, the Bankruptcy Trustees' complaints refer to an action by Mr. Fiorillo to halt the foreclosures of certain properties following the issuance of the May 2006 foreclosure notices. The Bankruptcy trustees' complaints also refer to an action filed by Mr. Arcuri, at Mr. Massad's direction, against Mr. Fiorillo in or about the end of 2008 in order to obtain an injunction related to the 425B Salisbury Street property, and a January 2011 lawsuit, also filed by Mr. Arcuri, to obtain a lien on 49 Old Colony Drive.[44] The record does not include copies of documents from any of these actions.

The USDC Action which was commenced in 2007 is at its essence a RICO action in which the Fiorillos and SSDC, as well as other entities, sued the same defendants in these adversary proceedings, as well as some of their affiliates, including

**41.** A copy of the complaint filed in C.A. 06–1311 is attached as exhibit B to the memorandum of Mr. Mallegni and LBM in support of their motion to dismiss.

**42.** *See* Exhibit B to the memorandum of Mr. Massad.

**43.** Mr. Massad cites to the Massachusetts Appeals Court electronic docket entry, a copy of which has not been provided, in support of his statement that Mr. Fiorillo's appeal of the trial court's refusal to vacate its summary judgment order in favor of the state court defendants in CA # 06–1311 was dismissed by the Appeals Court.

**44.** Mr. Massad's memorandum in support of his motion to dismiss refers to two state court actions commenced by Mr. Arcuri against Ms. Krowel. According to the memorandum, in the second action (CA 2010–02552), the state court entered summary judgment allowing the lien on the 49 Old Colony Drive property but suspended the assessment of damages because of Ms. Krowel's bankruptcy.

Mr. Norris and Ms. Massad.[45] On September 7, 2010 Mr. Fiorillo and Ms. Krowel moved to voluntarily dismiss the USDC Action. In his decision allowing them to dismiss the proceeding without prejudice, Judge Saylor explained:

[T]his case is relatively old; it was filed nearly four years ago, on January 16, 2007. Despite the lengthy passage of time, plaintiffs have done little to move the case forward to trial. Instead, litigation has been characterized by multiple stops and starts, with a tangled web of procedural problems and issues and little, if any, discovery. Plaintiffs have been directly responsible for many of the problems and delays, with shifting legal theories and repeated failures to adhere to deadlines or comply with discovery obligations.

More recently, on August 24, 2010, Magistrate Judge Hillman entered a discovery order that required that Mr. Fiorillo provide "responsive, complete, and non-evasive" answers to interrogatories on or before September 8, 2010. At the hearing, Magistrate Judge Hillman advised the plaintiffs that he would recommend dismissal with prejudice and monetary sanctions if they did not provide the requested responses. Rather than comply with the August 24, 2010 order, or face possible sanctions, plaintiffs filed the present motion to dismiss on September 7, 2010. Plaintiffs also failed to respond to interrogatories propounded by defendant Commerce Bank and trust Company, which forced commerce to file a motion to compel (which plaintiffs did

not oppose), and which in turn led to a court order that plaintiff provide responses by September 17, 2010. The court is obviously concerned that a voluntary dismissal may be intended by plaintiffs, at least in part, as an effort to evade their discovery obligations and/or the imposition of sanctions.

Nevertheless, and as noted, the Court cannot simply dismiss the matter with prejudice without giving plaintiffs an opportunity to withdraw the motion. The court is concerned that doing so may present yet another occasion for delay. Furthermore, it appears that the factual predicates upon which this lawsuit are based occurred some years ago, and that any future claims based on those events are likely outside the relevant limitations period. Defendants are therefore likely to achieve the finality they seek even if the matter is dismissed without prejudice.

Consequently the USDC Action was dismissed without prejudice on September 14, 2010.[46]

### The Debtors' and SSDC's Bankruptcy History

Mr. Fiorillo, Ms. Krowel and SSDC are certainly not strangers to the bankruptcy court. SSDC filed a voluntary petition under chapter 11 of title 11 of the U.S.Code (the Bankruptcy Code) on June 26, 2006 (case # 06–41109–JBR) that was dismissed on September 20, 2006. It filed another chapter 11 petition on January 9, 2007 (case # 07–40073–JBR) that was dismissed on January 12, 2007, after a hear-

---

45. Originally there were two federal court lawsuits, 07–40015–FDS and 07–40122–FDS. The actions were consolidated and the USDC Amended Complaint, incorporating allegations for both actions, was filed.

46. A copy of the decision is attached as Exhibit G to Mr. Massad's memorandum. The decision states that Ms. Krowel dismissed her actions on September 1, 2010 with prejudice. It is unclear whether Ms. Krowel sought dismissal with prejudice in addition to the dismissal filed by LBM as assignee of her claims. In any event Judge Saylor vacated the dismissal with prejudice.

ing at which my predecessor, Judge Joel B. Rosenthal, found that the case involved a two party dispute between SSDC and its creditor, Gamewell Realty, Inc., an entity affiliated with the defendants. SSDC filed its third chapter 11 petition (case # 10–42655–MSH) on May 25, 2010. After a hearing on both the United States trustee's motion to dismiss and my order to show cause why the case should not be dismissed as SSDC was attempting to proceed *pro se*, the case was dismissed on June 2, 2010. On July 21, 2010, SSDC filed its fourth chapter 11 case (case # 10–43652–MSH), again *pro se*, and that case was dismissed on July 28, 2010, with a one year bar against filing another bankruptcy. All of SSDC's bankruptcy petitions were signed by Mr. Fiorillo as president of SSDC.

Ms. Krowel's current case is her fifth filing since 2006. She filed a voluntary chapter 11 petition on October 6, 2006 (case # 06–42091–JBR) in an effort to have the foreclosure sale on 249 Lincoln Street set aside. That case was dismissed on November 8, 2006, on Ms. Krowel's motion claiming that the underlying reasons for the bankruptcy had been resolved. On October 21, 2009, Ms. Krowel, claiming that a creditor called Connect Plus International Corporation, which held the second mortgage on the 157 Shrewsbury Street property, had scheduled a foreclosure sale, filed a chapter 13 petition (case # 09–44413–JBR) and sought an order enjoining the foreclosure. After notice and a hearing on January 20, 2010, the court granted Mr. Arcuri's motion to dismiss the chapter 13 case as Ms. Krowel's liabilities exceeded the jurisdictional limits for a chapter 13 case. On April 21, 2010, Ms. Krowel filed a chapter 7 petition (case # 10–41945–MSH) that was dismissed on June 1, 2010, as a result of her failure to file required documents. On June 14, 2010, she filed another chapter 7 petition

(case # 10–43004–MSH). That case was dismissed under Bankruptcy Code § 109(g) on July 15, 2010, on Mr. Arcuri's motion and Ms. Krowel was barred from filing another bankruptcy case for 180 days. After a hearing on Ms. Krowel's motion for reconsideration, I vacated the dismissal under § 109(g) but dismissed the case based upon Ms. Krowel's willful failure to file the documents required by the Bankruptcy Code. Her current chapter 7 case was filed on September 12, 2011.

Mr. Fiorillo filed his current case as a voluntary petition under chapter 11 of the Bankruptcy Code on August 23, 2010. His case was converted to one under chapter 7 on October 7, 2010.

The Bankruptcy Trustees filed their respective lawsuits on January 18, 2012, and shortly thereafter I allowed their motions to consolidate the adversary proceedings.

### Jurisdiction

### The *Rooker–Feldman* Doctrine

Because the *Rooker–Feldman* doctrine directly affects a court's subject matter jurisdiction, it is appropriate to begin by discussing whether and to what claims the doctrine applies here. The defendants allege that the *Rooker–Feldman* doctrine applies to divest this court of jurisdiction with respect to the claims relating to the properties at 425B Salisbury Street and 49 Old Colony Drive because final orders were entered by the state court in the two cases filed by Mr. Arcuri against Ms. Krowel involving those properties. The Bankruptcy Trustees disagree, arguing that the orders are not final and that the parties in the state court action are different from those here.

The *Rooker–Feldman* doctrine derives its name from two Supreme Court cases, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923),

and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). It prevents lower federal courts from acting as "superappeals" courts sitting in review of state court orders "after the state proceedings ended." *Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). "While such judgments will often qualify as "final judgments" under [28 U.S.C.] § 1257 [granting the Supreme Court the right to review, in certain instances, final judgments and decrees of the highest state courts] and/or carry state law preclusive effect, neither § 1257 finality nor state law preclusive effect is necessary under the *Exxon Mobil* test." *Federacion de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico,* 410 F.3d 17, 27 (1st Cir.2005). "*Rooker–Feldman* is broader and blunter than res judicata, and does not impose res judicata's technical requirements, [s]o, despite the disapproval of scholars, federal courts regularly use *Rooker–Feldman* to rebuff collateral attacks on prior state court judgments without purporting to apply the technical preclusion rules of res judicata." *Id.* at 22.

■ As the Supreme Court noted in *Exxon Mobil,* "[t]he *Rooker–Feldman* doctrine ... is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil,* 544 U.S. at 284, 125 S.Ct. at 1521–22.

■ The doctrine is inapplicable to federal actions brought by non-parties to the state court litigation. *Id.* at 287, 125 S.Ct. at 1523–24. Notably, however, in *Lance v. Dennis,* 546 U.S. 459, 465–66

and n. 2, 126 S.Ct. 1198, 1202 and n. 2, 163 L.Ed.2d 1059 (2006), the Supreme court left open the possibility in limited circumstances that the doctrine may be applied to a party who was not named in the state court action. The Court offered as an example of such possible circumstance an estate taking a *de facto* appeal of a state court decision involving the estate's decedent. *Rooker–Feldman* "foreclose[s] lower federal court jurisdiction where the issues in the case are "inextricably intertwined" with controversies adjudicated by a state court." *Vazquez v. Reo Properties Corp. (In re Vazquez),* 467 B.R. 550, 553 (Bankr.D.P.R.2012). And the claims are "inextricably intertwined" "if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it." *Id.* at 553 (citing *Sheehan v. Marr,* 207 F.3d 35, 39–40 (1st Cir.2000)). The *Rooker–Feldman* doctrine applies if the federal relief to be granted results in effectively reversing or voiding the state court's order. Thus, even if the federal claims were not asserted in the state court litigation, they may still be barred under the *Rooker–Feldman* doctrine. *Id.*

■ Courts recognize an exception to the *Rooker–Feldman* doctrine "where the plaintiff did not have a full and fair opportunity to litigate his claim in the prior state-court proceeding." *Johnson v. Rodrigues,* 226 F.3d 1103, 1110 (10th Cir.2000). The exception applies only to cases in which the federal plaintiff was not a party to the state court proceeding.

■ The *Rooker–Feldman* doctrine is "jurisdictional in nature" and therefore "if a case is dismissed because the *Rooker–Feldman* doctrine applies, it means the court has no subject-matter jurisdiction to hear the case." *Mills v. Harmon Law Offices, P.C.,* 344 F.3d 42, 44 (1st Cir.2003)

(citing *In re Middlesex Power Equip. & Marine, Inc.*, 292 F.3d 61, 66 (1st Cir. 2002)). Consequently, "it cannot be waived". *In re Zambre*, 306 B.R. 428, 432 (Bankr.D.Mass.2004), (citing *In re Stoddard*, 248 B.R. 111, 120 (Bankr.N.D.Ohio 2000)).

Application of these principles to the judgment and orders received by Mr. Arcuri in his state court action against Ms. Krowel does not require the dismissal of the claims relating to 425B Salisbury Street and 49 Old Colony Drive to the extent that the claims asserted are those assigned to the Bankruptcy Trustees by the Family Trust and the Colony Trust, neither of which was a party to the state court actions. To the extent, however, that Mr. Baldiga is seeking damages on behalf of Ms. Krowel, as he admits in the Bankruptcy Trustees' joint response to the motions to dismiss, he stands in the shoes of the state court losing party complaining of injuries caused by the injunction and other orders of the Worcester Superior Court, including the sale of Ms. Krowel's rights in the USDC Action. Thus, his presence as a party would fall within the very limited circumstances described in *Lance v. Dennis* where strict identity of the losing party is not required.

Moreover Mr. Baldiga's complaint on behalf of Ms. Krowel's estate rests upon the assertions that the state court actions and the judgments obtained are shams and that the results achieved in the state court proceedings should be ignored. The action in which Mr. Arcuri obtained an injunction against the transfer of 425B Salisbury Street appears from the complaints to have been finally resolved well prior to the commencement of these adversary proceedings. The complaints do not state what is left with respect to Mr. Arcuri's second action involving 49 Old Colony Drive. Because it is unclear whether there is an order sufficient to end that litigation, I will not dismiss Ms. Krowel's action with respect to 49 Old Colony Drive because of *Rooker–Feldman* but I will dismiss Mr. Baldiga's claims to the extent asserted on behalf of Ms. Krowel's estate relating to 425B Salisbury Street. Nevertheless, as discussed below, Mr. Baldiga's claims on behalf of Ms. Krowel's estate must be dismissed anyway because she had no interest in 425B Salisbury Street or 49 Old Colony Drive. *Rooker–Feldman* and a lack of standing combine to put an end to Mr. Baldiga's claims in these adversary proceedings as the representative of Ms. Krowel's bankruptcy estate.

### Jurisdiction Generally

Even without the defendants' challenge, I am obligated to determine whether and to what extent I have jurisdiction to hear and determine all counts of the complaints. *Feliciano v. DuBois*, 846 F.Supp. 1033, 1041 (D.Mass.1994) ("[A] court always has an obligation to consider, even on its own initiative as well as on motion of an opposing party, whether it has subject matter jurisdiction.").

The Bankruptcy Trustees assert jurisdiction of the bankruptcy court to hear and determine their claims based on (i) RICO jurisdiction under 18 U.S.C. § 1964(c); (ii) federal question jurisdiction under 28 U.S.C. § 1331; (iii) jurisdiction under 28 U.S.C. § 157; (iv) jurisdiction under 11 U.S.C. § 105(a); (v) supplemental jurisdiction under 28 U.S.C. § 1367 and (vi) jurisdiction under 28 U.S.C. § 1334. Most of these jurisdictional sources do not apply to bankruptcy courts which are courts of limited jurisdiction. *Celotex v. Edwards*, 514 U.S. 300, 307, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995). The RICO statute confers jurisdiction on federal district courts, not bankruptcy courts. 18 U.S.C. § 1964(c). Federal question jurisdiction under 28 U.S.C. § 1331 resides in

the district courts. Bankruptcy Code § 105(a) does not confer any jurisdiction on a bankruptcy court. *FDIC v. Majestic Energy Corp. (In re Majestic Energy Corp.)*, 835 F.2d 87, 89 (5th Cir.1988) (discussing the interrelation of 28 U.S.C. §§ 157 and 1334). Finally, it is far from clear that the supplemental jurisdiction statute, 28 U.S.C. § 1367, applies to bankruptcy courts.[47] Rather it is 28 U.S.C. § 1334, coupled with the district court's referral authority under 28 U.S.C. § 157(a), from which bankruptcy court jurisdiction derives.

Pursuant to 28 U.S.C. § 1334(a) the district court has original and exclusive jurisdiction over cases filed under title 11 (the Bankruptcy Code), that is, the bankruptcy case itself, and pursuant to § 1334(b), the district court's jurisdiction is original but not exclusive in "all civil proceedings arising in, arising under or related to" the bankruptcy case. Congress empowered district courts to refer to bankruptcy courts all bankruptcy cases as well as civil proceedings which arise in or under the Bankruptcy Code and those related to bankruptcy cases. 28 U.S.C. § 157(a). "In Massachusetts, the district court has referred the broadest possible universe of cases which a bankruptcy court could hear, namely all cases over which the district court may exercise jurisdiction under ei-

ther § 1334(a) or (b)." *In re NSCO, Inc.*, 427 B.R. 165, 176 (Bankr.D.Mass.2010).

An adversary proceeding, which is a civil proceeding, "arises under" the Bankruptcy Code, if it involves a cause of action created by title 11. *Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir.1987). Proceedings "arising in" a bankruptcy case "are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Id.* at 97. Together, proceedings that "arise in" and "arise under" title 11 constitute the bankruptcy court's "core" jurisdiction. *See* 28 U.S.C. § 157(b); *Id.* at 96–97.

A bankruptcy court has jurisdiction over a non-core proceeding provided the proceeding is "related to" a bankruptcy case. "The breadth of the bankruptcy court's related to jurisdiction is great but not unlimited." *Vienneau*, 410 B.R. at 333. "The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re G.S.F. Corp.*, 938 F.2d 1467, 1475 (1st Cir.1991) (quoting *Pacor v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984)).

The Bankruptcy Trustees, citing 28 U.S.C. S 157(b)(2)(H), allege that these

---

**47.** Indeed, most courts have concluded that bankruptcy courts are not authorized to exercise supplemental jurisdiction over claims under 28 U.S.C. § 1367. *See, e.g., In re Walker*, 51 F.3d 562, 572–73 (5th Cir.1995); *Halvajian v. Bank of New York*, 191 B.R. 56, 58–59 (D.N.J.1995); *McKinstry v. Sergent (In re Black Diamond Min. Co., LLC)*, Adv. Pro 11–7010, 2011 WL 4433624, at *5 (Bankr. E.D.Ky. Sept. 21, 2011); *In re Baruch*, 446 B.R. 844, 849 (Bankr.S.D.Ohio 2011); *Butler v. Moore (In re Eastern Towers, Inc.)*, Adv. Pro 07–1313, 2010 WL 346914 (Bankr.D.Mass. Jan. 22, 2010); *Vienneau v. Saxon Capital, Inc. (In re Vienneau)*, 410 B.R. 329, 334–35 (Bankr.D.Mass.2009); *In re Valley Food Servs., LLC*, 400 B.R. 724, 728–30 (Bankr. W.D.Mo.2008); *In re Enron Corp.*, 353 B.R. 51, 59–63 (Bankr.S.D.N.Y.2006); *In re Conseco*, 305 B.R. 281, 286–87 (Bankr.N.D.Ill. 2004); *In re Davis*, 216 B.R. 898, 902 (Bankr. N.D.Ga.1997); *In re Goldstein*, 201 B.R. 1, 6–7 (Bankr.D.Me.1996); *Boyajian v. DeLuca (In re Remington Development Group, Inc.)*, 180 B.R. 365, 374 (Bankr.D.R.I.1995) ("The opinions concluding that supplemental jurisdiction may be exercised by the bankruptcy court do so without disciplined analysis of §§ 157(a) and 1334(b)").

proceedings come within the core jurisdiction of this court "to determine, avoid or recover fraudulent conveyances." The Bankruptcy Code permits a trustee to avoid fraudulent conveyances that are avoidable under state law § 544(b), or under federal law (§ 548). "Claims of this kind are 'not derivative of the bankrupt' but rather ... 'statutory causes of action' under the Bankruptcy Code for the benefit of the creditors." *Matter of National Gypsum Company,* 118 F.3d 1056, 1066 (5th Cir.1997) (citing *Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149, 1155 (3d Cir.1989) (holding that a RICO claim was derivative of the debtor and must be arbitrated but a fraudulent conveyance claim was not))." *Sherman v. Main Event, Inc.,* 3:02–CV–1314, 2003 WL 251653, at *5 (N.D.Tex. Feb. 3, 2003). After scouring the complaints I can find nothing to suggest that the claims which the Bankruptcy Trustees are asserting are anything other than claims which derived from causes of action available to the debtors, SSDC, the Family Trust or the Colony Trust. Nothing in the complaints suggests that SSDC, the Family Trust or the Colony Trust are creditors of the debtors. Thus, there is no basis for finding that these adversary proceedings are core matters under 28 U.S.C. § 157(b)(2)(H) or any other part of § 157(b).

■ Nevertheless, as actions with the potential to augment the bankruptcy estates, the adversary proceedings fall within the court's related-to jurisdiction. While I may hear non-core related-to matters, absent the consent of all the parties, I must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

■ A party's consent to a bankruptcy court's entering final orders in a related-to proceeding may be express or implied. *In re G.S.F. Corp.,* 938 F.2d 1467, 1477 (1st Cir.1991). Certainly the parties here have consented to my entering final orders dismissing counts III and IV of the complaints as they relate to Mr. Massad and Commerce Bank and I will do so. Also, as indicated previously, under the *Rooker–Feldman* doctrine I must dismiss Mr. Baldiga's claims, asserted on behalf of Ms. Krowel's bankruptcy estate, relating to the 425B Salisbury Street property. Finally, although the defendants previously asked the district court to withdraw the reference in these adversary proceedings,[48] none of the parties, either in a pleading relating to the motions to dismiss or at oral argument, challenged my ability to enter final orders with respect to what is left and this I will take as consent to my disposing of what remains in the motions to dismiss.[49]

**48.** The defendants, none of whom have filed proofs of claim in either bankruptcy case, previously filed motions to withdraw the reference under 28 U.S.C. § 157(d) and (e) because the complaints involve RICO counts, and because the parties have requested a jury trial and do not consent to its being conducted in the bankruptcy court. The motion was denied without prejudice by the district court to permit the bankruptcy court to consider the motions to dismiss and other pretrial matters.

**49.** In the event the defendants were to allege that their motion to withdraw the reference is indicative of their lack of consent to my jurisdiction to enter final orders, the Local Rules for the United States District Court for the District of Massachusetts permit the district court to treat this memorandum and orders

## Positions of the Parties

All of the defendants assert that the complaints fail to state claims under RICO although for slightly different reasons. Mr. Massad advocates dismissal of the RICO counts because there are no allegations that the actions affected interstate or foreign commerce or that there is any RICO enterprise that exists separate from the pattern of racketeering. Mr. Mallegni and LBM argue that the Bankruptcy Trustees have failed to allege even a pattern of activity because there is only one predicate act that falls within the RICO statute of limitations, namely that Mr. Fiorillo was wrongfully forced into the October 2006 settlement of the state court lawsuit. And the defendants note that the injuries alleged to arise from the RICO violations occurred more than four years prior to both the commencement of these adversary proceedings and the filing of the debtors' bankruptcy cases, thus placing the claims beyond the statute of limitations. All of the defendants assert that the current adversary proceedings are barred under the doctrine of *res judicata* as the allegations which form the foundation of the complaints have been or could have been raised in the previous state and federal district court litigation.[50] In fact, Mr. Mallegni and LBM note that the claims asserted by Ms. Krowel in the USDC Action were sold to Mr. Arcuri pursuant to an order entered by the state court in Mr. Arcuri's action against her. Those claims were then dismissed by LBM as the assignee of Mr. Arcuri, thereby putting an end to whatever claims she might have had against the defendants.[51]

Mr. Mallegni and LBM, the only defendants against whom counts III and IV remain pending, raise the additional arguments that the contract claims are barred by the statute of frauds.

Not surprisingly the Bankruptcy Trustees see things differently. They maintain that the RICO claims are not barred by the statute of limitations because at least some of the injuries are ongoing and point to Mr. Fiorillo's October 2006 settlement of his state court lawsuit under duress as a predicate act under RICO. They also allege that there is no bar to asserting the RICO counts that relate to the properties at issue in the previous lawsuits which were settled are not barred. The Bankruptcy Trustees argue that the defendants misunderstand that the RICO counts are based on the fact that the settlements of the state and federal court lawsuits were brought about solely and directly in re-

emanating from it as proposed findings of fact and conclusions of law. LR, D. Mass. 206.

**50.** There is some confusion as to the parties' use of the generic term *"res judicata."* Mr. Mallegni and LBM expressly refer to both issue and claim preclusion while Mr. Massad uses the term synonymously with claim preclusion. As the court in *Minarik Elec. Co. v. Electro Sales Co.*, 223 F.Supp.2d 334, 336–37 (D.Mass.2002), recognized, "[a]lthough debate remains, most federal district courts view res judicata as being synonymous with claim preclusion. Some jurisdictions include issue preclusion along with claim preclusion under a res judicata umbrella. However, the current tendency of the courts is to use the term res judicata to refer solely to the doctrine of claim preclusion." Recently, in *Korn v. Paul Revere Life Ins. Co.*, 83 Mass.App.Ct. 432, 436 and n. 2, 984 N.E.2d 882, 886 and n. 2 (Mass.App.Ct.2013), the Massachusetts Appeals Court, citing prior U.S. Supreme Court decisions, stated "[i]n Federal court, 'the preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.' " However the preclusive effect is denominated, there is not "any apparent distinction in the development of the law of res judicata in Massachusetts or on the Federal level."

**51.** They do not address Judge Saylor's order vacating Ms. Krowel's dismissal of the USDC Action with prejudice and permitting her dismissal of the action without prejudice.

sponse to the RICO defendants' threats. Therefore, they assert that *res judicata* does not apply. Because they believe that Mr. Arcuri's state court litigation and its judgment were mere "shams," they give scant weight to LBM's voluntary dismissal of Ms. Krowel's claims in the USDC Action but note that the injuries Ms. Krowel allegedly suffered and for which Mr. Baldiga seeks damages relate only to the 425B Salisbury Street and 49 Old Colony Drive properties and that those injuries occurred in 2009 and 2011, both after the date Mr. Arcuri purchased Ms. Krowel's rights in the USDC Action.[52] Finally, the Bankruptcy Trustees, who are asserting breach of contract claims only with respect to 157 Shrewsbury Street, 249 Lincoln Street and 88 Shrewsbury Street, request that to the extent that the complaints do not allege the existence of written contracts, but urge me to infer their existence or permit them to amend the complaints to plead that written agreements exist.

**Motion to Dismiss Standards**

Before turning to the correct standard to be applied, I note that many of the facts set forth above, especially those relating to previous litigation among these parties and others, are drawn not from the complaints but from certain exhibits to the memoranda in support of the motions to dismiss and the joint response thereto. This poses no difficulty because "[a] court may also consider a limited universe of materials not included in or attached to the complaint, such as documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice." *In re Bailey*, 437 B.R. 721, 727 (Bankr.D.Mass.2010) (internal citations and quotation marks omitted).

Here, the exhibits on which I base certain facts are the pleadings and decisions of other courts. "Neither category compels the conversion of the defendants' motion to dismiss to one for summary judgment." *Nickless v. HSBC Bank USA, National Association (In re Marron)*, 462 B.R. 364, 371 (Bankr.D.Mass.2012). *See also Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir.1994) (documents from prior state court proceedings are public records that do not require conversion of motion to dismiss to one for summary judgment).

As for the proper standard in deciding a motion to dismiss, a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R.Civ.P. 12(b)(6), made applicable to this proceeding by Fed. R. Bankr.P. 7012. In deciding a motion to dismiss "a court must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993). To avoid dismissal of a claim under Rule 12(b)(6), a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). It is not enough to speculate as to the facts or simply allege the elements of a claim. *Id.* I am "not bound to accept legal conclusions couched in fact." *In re Di Vittorio*, 430 B.R. 26, 44 (Bankr.D.Mass. 2010). Nor should a court give credence to any "fact" which has been "conclusively contradicted by plaintiffs' concessions or otherwise." *Chongris v. Bd. of Appeals of*

---

52. *See* Bankruptcy Trustees' joint response at p. 12 n. 11. The Bankruptcy Trustees also note that the real parties in interest with standing to pursue these claims are their assignees, the Family Trust with respect to 425B Salisbury Street and the Colony Trust with respect to 49 Old Colony Drive.

*Town of Andover,* 811 F.2d 36, 37 (1st Cir.1987).

## Discussion

As indicated at the outset, counts I and II of the Bankruptcy Trustees' complaints allege civil RICO violations and RICO conspiracy while counts III and IV allege breach of contract and breach of the implied covenant of good faith and fair dealing.

The complaints do not identify with particularity in what capacity the Bankruptcy Trustees assert their claims relating to the individual properties. Rather they leave it to the court to ferret out which trustee has standing to assert claims in connection with each of the six properties and in what capacity those claims are being asserted. As set forth in greater detail below, Mr. Goldsmith as the representative of Mr. Fiorillo's bankruptcy estate claims damages relating to 23 A, B, C and D Quinsigamond Avenue; 157 Shrewsbury Street; 88 Shrewsbury Street and 249 Lincoln Street although it is unlikely that Mr. Fiorillo, in his individual capacity, even held an interest in the last two properties. Mr. Goldsmith may also be seeking damages relating to 88 Shrewsbury Street and 249 Lincoln Street in his capacity as the assignee of SSDC's claims. As discussed previously, Mr. Baldiga, as representative of Ms. Krowel's bankruptcy estate, seek damages relating only to the former residence at 425B Salisbury street and the current one at 49 Old Colony Drive.[53] Because the Bankruptcy Trustees noted in their joint response that the real parties in interest with respect to the two residential properties are the two trusts, I assume that to the extent Mr. Baldiga can claim damages through Ms. Krowel for the harms allegedly arising from the defendants' actions involving these properties, Mr. Goldsmith would like the same as the representative of Mr. Fiorillo's bankruptcy estate. Both bankruptcy trustees also seek damages relating to 425B Salisbury Street property as the assignees of the Family Trust's claims and 49 Old Colony Drive as the assignees of the Colony Trust's claims.

### Civil RICO

"Section 1964(c) of the Title [18] establishes a private cause of action under RICO for violations of § 1962.[54] The Bankruptcy Trustees allege that Messrs. Massad and Mallegni committed violations of both 18 U.S.C. § 1962(c) and § 1962(d).

Section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Thus § 1962(c) can be violated in one of two ways: by a pattern of racketeering or the collection of an unlawful debt.

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee. . . .

---

**53.** Mr. Baldiga is not pursuing any claims Ms. Krowel may have had in 249 Lincoln Street. As discussed below, Ms. Krowel's claims relating to this property and the October 2006 settlement of her and SSDC's state court action would be barred by the statute of limitations.

**54.** 18 U.S.C. § 1964(c) provides in relevant part:

■ The parties focus much of their attention on that part of the statute which speaks to the conduct of an enterprise's affairs "through a pattern of racketeering activity." Because actions under § 1962(c) are often based upon allegations of such a pattern, the Supreme Court has recognized that "the heart of any RICO complaint is the allegation of a *pattern* of racketeering." *Rotella v. Wood*, 528 U.S. 549, 556, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000) (emphasis in the original). For RICO claims resting upon that portion of the statute, the Court of Appeals for the First Circuit has summarized the required allegations.

> To state a claim under section 1962(c), a plaintiff must allege each of the four elements required by the statute: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. '479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).

*Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 41 (1st Cir.1991) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985)). "It is not enough for plaintiff to simply allege these elements in boilerplate language; the complaint must contain sufficient facts supporting each element." *Goren v. New Vision Intern., Inc.*, 156 F.3d 721, 727 (7th Cir.1998).

■ Moreover, in order to recover damages under RICO, the plaintiff must prove that he suffered an injury "by reason of a violation of § 1962." In other words, he must show that the predicate act was the proximate cause of his harm. *Sebago, Inc. v. Beazer East, Inc.*, 18 F.Supp.2d 70, 79 (D.Mass.1998) ("A plaintiff can establish standing under § 1964(c) only by demonstrating (1) a violation of § 1962, and (2) harm 'by reason of' the violation. *Sedima, S.P.R.L. v. Imrex Co.*,

473 U.S. 479, 495–97, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *Pujol v. Shearson American Express, Inc.*, 829 F.2d 1201, 1205 (1st Cir.1987)").

### The Racketeering Enterprise

■ The racketeering enterprise includes "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The group must "associate[ ] together for a common purpose of engaging in a course of conduct . . ." *First Capital Management v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir.2004) (citing *U.S. v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)). No formal structure is required. It is enough that the enterprise has "a purpose, relationship among those associated with the enterprise, and longevity sufficient to permit theses associates to pursue the enterprise's purpose." *Boyle v. U.S.*, 556 U.S. 938, 946, 129 S.Ct. 2237, 2244, 173 L.Ed.2d 1265 (2009). The enterprise must be distinct from the person conducting the enterprise's affairs and separate from the pattern of racketeering activity. *Id.* As the First Circuit explained in examining *Turkette:*

> The enterprise is an entity, a group of persons associated for a common purpose of engaging in a course of conduct. The pattern of racketeering activity, on the other hand, is a series of criminal acts as defined by the RICO statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may "coalesce," proof of one does not necessarily establish the other. The "enterprise" is

not the "pattern of racketeering activity;" it is an entity apart and distinct from the pattern of activity in which it engages. The existence of an enterprise is, therefore, a separate element which must be proven.

*Libertad v. Welch,* 53 F.3d 428, 441 (1st Cir.1995) (internal quotation marks and citations omitted).

 Mr. Massad argues that the enterprise must be separate from the pattern of racketeering and here it was not. He bases his challenge on the fact that, according to the complaints, the purpose of the enterprise was "to extort money from the Debtors, [SSDC], the Fiorillo Family Trust, and the Old Colony Trust, through real estate scams." [55] This, he argues, is the very substance of the predicate acts. Mr. Massad is incorrect. The alleged association was that of Messrs. Mallegni, Massad and Norris, Ms. Massad, LBM and Commerce Bank. Their alleged common purpose was to extort money. The predicate acts alleged by the Bankruptcy Trustees include threats of bodily harm and death in addition to the alleged loan scams. This is sufficient especially in light of the First Circuit's acknowledgement that the proof to establish the enterprise and the pattern of racketeering activity may "coalesce."

**The Impact on Interstate Commerce**

 The defendants argue that the complaints fail to allege explicitly that the "enterprise affected interstate commerce." In order to state an action under the RICO statute, the enterprise must be engaged in or its activities affect interstate or foreign commerce. But there are no magic words needed. Indeed, "a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1965. "RICO requires that the activities of the 'enterprise,' not each RICO 'predicate act,' affect interstate commerce." *United States v. Rone,* 598 F.2d 564, 573 (9th Cir.1979). "RICO requires no more than a slight effect upon interstate commerce." *U.S. v. Doherty,* 867 F.2d 47, 68 (1st Cir.1989). This minimal effect is demonstrated by "proof of a probable or potential impact." *United States v. Juvenile Male,* 118 F.3d 1344, 1349 (9th Cir.1997).

In *Doherty,* the Court of Appeals for the First Circuit upheld the RICO convictions of several of the defendants who conspired to steal and sell advance copies of civil service examinations to police officers seeking promotions. Noting that other courts have found an impact on interstate commerce in instances in which the impact seemed remote,[56] the First Circuit concluded that evidence that the enterprise's sale of even one exam may have prevented the seventy out-of-state applicants from obtaining jobs was sufficient to establish an effect on the interstate labor market. It also noted that after the theft, the personnel department's replacing of its locks with new locks ordered from Philadelphia affected interstate commerce as did the fact that an out of state consultant developed and graded some exams. The court observed that although the indictment failed to describe these facts in detail and simply

---

**55.** Complaints at ¶ 105.

**56.** The First Circuit noted that the Sixth Circuit found sufficient impact on interstate commerce in a case in which alcohol sold by the defendants was made out of state, *United States v. Robinson,* 763 F.2d 778, 781 (6th Cir.1985), and that the Fourth Circuit found an impact on interstate commerce when supplies used in a bookmaking enterprise originated out of state, *United States v. Allen,* 656 F.2d 964 (4th Cir.1981), and when the interstate telephone calls were made, *United States v. Altomare,* 625 F.2d 5, 7–8 (4th Cir.1980).

stated that "the activities of the enterprise affected interstate commerce," such general language is legally sufficient. *U.S. v. Doherty*, 867 F.2d at 68 (citing *United States v. Diecidue*, 603 F.2d 535, 547–48 (5th Cir.1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980) (conclusory allegation of effect on commerce sufficient in RICO indictment)).

■■■ The complaints allege that Commerce Bank, a member of the enterprise, is federally insured. This allegation is enough to pass the interstate commerce test. *Cf. U.S. v. Benjamin*, 252 F.3d 1, 9 (1st Cir.2001) (FDIC insurance demonstrated impact on interstate commerce under 18 U.S.C. § 1957).

### The Pattern of Racketeering Activities and the Predicate Acts

■■■ The acts which constitute "racketeering activity," the so-called predicate acts, are set forth in 18 U.S.C. § 1961(1). "The list is exclusive." *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F.Supp. 576, 586 (S.D.N.Y. 1995). The list includes, among other things, a list of certain offenses indictable under Title 18 and "any act or threat involving ... extortion ... which is chargeable under State law and punishable by imprisonment for more than one year." It is not enough that a party commits one of the enumerated predicate acts; he must engage in a "pattern of racketeering activity," which requires at least two predicate acts within a ten year period. 18 U.S.C. § 1961(5). In addition the acts must be related and "amount to, or ... otherwise constitute a threat of, *continuing* racketeering activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989) (emphasis in the original). " 'Conti-

nuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* at 241, 109 S.Ct. at 2902. *See also Systems Management, Inc. v. Loiselle*, 303 F.3d 100, 105–06 (1st Cir.2002).

The Bankruptcy Trustees allege that the predicate acts consist of the "repeated and continuing violations" of MASS. GEN. LAWS ch. 265, § 25 (which makes verbal or written threats to injure a person or his property a crime punishable by imprisonment in the state prison for not more than fifteen years) and violations of the following federal statutes enumerated in § 1961(1): 18 U.S.C. § 1951 (relating to interference with commerce by robbery or extortion); 18 U.S.C. § 892 (relating to extortionate extensions of credit); and 18 U.S.C. § 894 (relating to collection of extensions of credit or punishment for the nonpayment of the extensions of credit by extortionate means). The repetition of these acts forms the pattern of racketeering activity.

■■■ Mr. Mallegni maintains that the RICO claims must be dismissed because there is only one predicate act which falls within the RICO four year statute of limitations, namely coercing Mr. Fiorillo into the October 2006 settlement, and one act, standing alone, is not a pattern. But as the statute states, the predicate acts do not all need to fall within RICO's statute of limitations.[57] Rather there must be at least two predicate acts within a ten year period. "An act may serve as a predicate act if it falls within ten years of another predicate act even if the act does not fall

57. RICO's statute of limitations is discussed in greater detail *infra*.

within the statute of limitations." *Flores v. Emerich & Fike*, 05-0291, 2008 WL 2489900, at *26 (E.D.Cal. June 18, 2008). "[T]he statute of limitations looks to the discovery of the injury, not the date of predicate acts." *Id.* Even assuming the allegedly coerced settlement is deemed to be only one predicate act, the repayment of amounts not owed to the RICO defendants as is alleged to have occurred demonstrates a pattern. Thus the complaints have pled at least two predicate acts within a ten year period sufficiently related and continuing.

But not all RICO injuries must result from "a pattern of racketeering" activity. The single "collection of an unlawful debt" is also a violation of § 1962(c).[58] *U.S. v. Weiner*, 3 F.3d 17, 23–24 (1st Cir.1993). Section 1961(6) of the RICO statute "defines two separate categories of unlawful debts: one involving gambling activity and the other involving loansharking activity." *U.S. v. Giovanelli*, 945 F.2d 479, 491 (2d Cir.1991). The Bankruptcy Trustees allege

that the RICO defendants engaged in "loan sharking,"[59] an apparent reference to the collection of unlawful debts.[60]

### RICO's Statute of Limitations

■■■■ As the parties acknowledge, although the RICO statute does not contain an express statute of limitations, the Supreme Court has determined that a four year statute of limitations is applicable to civil RICO actions. *Agency Holding Corp. v. Malley–Duff & Assoc., Inc.*, 483 U.S. 143, 150–56, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). Unlike the limitations period for criminal RICO violations which begins to run with the last predicate act, *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997), the limitations period for a civil RICO action begins to run when a plaintiff knew or should have known of the injury. "[D]iscovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *Rotella v. Wood*, 528 U.S. 549,

---

58. The complaints allege that the RICO defendants conspired to extort money and property ... through threats of physical violence and loss of property/title, and through loan sharking, over the past ten years. Complaints at ¶ 25. I understand this and other allegations in the complaints to mean that the RICO defendants may have committed both a "pattern of racketeering and "collection of an unlawful debt."

59. Complaints at 25.

60. The collection of an unlawful debt includes a debt "which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and ... which was incurred in connection with ... the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6). In Massachusetts, when the interest and expenses paid directly or indirectly aggregate greater than 20%, the rate is usurious. Mass. Gen. Laws ch. 271

§ 49(a). Such loans may be declared void. Mass. Gen. Laws ch. 271, 49(c). In the complaint the Bankruptcy Trustees allege that the RICO defendants loaned money at rates that ultimately exceeded 40%, sometimes reaching the 60 to 70 % range and even beyond. And there is little doubt that the debts were incurred in connection with the RICO defendants' businesses of lending money through the enterprise. Therefore, two of the three prongs for the collection of an unlawful debt are met. The question then becomes whether the loans were "unenforceable under State or Federal law." Mass. Gen. Laws ch. 271 § 49(d) provides a safe harbor that permits the enforcement of usurious loans provided the lender "notifies the attorney general of his intent to engage in a transaction or transactions which, but for the provisions of this paragraph, would be proscribed under the provisions of paragraph (a) providing any such person maintains records of any such transaction." The complaints and the motions to dismiss are devoid of any mention of whether the RICO defendants complied with the safe harbor provisions.

555, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). *See also Rodriguez v. Banco Cent.*, 917 F.2d 664, 665 (1st Cir.1990). Thus, a RICO plaintiff cannot wait until he discovers that an enterprise existed before taking action. *Matt v. HSBC Bank USA, N.A.*, CA. 10–11621, 2011 WL 4473764 (D.Mass. Sept. 23, 2011).

 The clock, of course, continued to run after the debtors filed bankruptcy but the Bankruptcy Code permits a trustee to assert claims for which the statute of limitations has not yet expired when the bankruptcy is filed provided the trustee brings the action before the later of (i) the end of the limitations period or (ii) two years after the order for relief. Bankruptcy Code § 108(a).[61] The adversary proceedings were filed within two years of Mr. Fiorillo's and Ms. Krowel's bankruptcy petitions. Thus the Bankruptcy Trustees may assert those RICO claims for which the four-year statute of limitations had not yet expired when the debtors filed their voluntary petitions, Mr. Fiorillo on August 23, 2010 and Ms. Krowel on September 12, 2011. Injuries incurred by Mr. Fiorillo prior to August 23, 2006 are barred. For claims asserted by Ms. Krowel's estate, the operative date is September 12, 2007. Because the assignors of certain claims being asserted by the Bankruptcy Trustees are not debtors, Bankruptcy Code § 108(a) is inapplicable to those claims. Thus, the Bankruptcy Trustees, as assignees of claims from either trust or SSDC, may seek damages in connection with injuries incurred only on or after January 18, 2008, four years before the adversary proceedings were filed.

Messers. Massad and Mallegni assert that the RICO claims are barred by the statute of limitations. The Bankruptcy Trustees claim that the injuries occurred either within the relevant periods or come under the continuing violation doctrine. That doctrine permits a plaintiff to establish the timeliness of acts that otherwise would be barred by the statute of limitations.

 As many courts have recognized, its name is a misnomer that has led to a misunderstanding of the doctrine.

Like too many legal doctrines, the "continuing violation" doctrine is misnamed. Suppose that year after year, for ten years, your employer pays you less than the minimum wage. That is a continuing violation. But it does not entitle you to wait until year 15 (assuming for the sake of illustration that the statute of limitations is five years) and then sue not only for the wages you should have received in year 10 but also for the wages you should have received in years 1 through 9. The statute of limitations begins to run upon injury (or, as is standardly the case with federal claims, upon discovery of the injury) and is not tolled by subsequent injuries....

The office of the misnamed doctrine is to allow suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought.... It is thus a doctrine not about a continuing, but about a cumulative, violation.

*Limestone Development Corp. v. Village of Lemont, Ill.*, 520 F.3d 797, 801 (7th Cir.

---

**61.** Bankruptcy Code § 108(a) provides:

If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may

commence such action only before the later of—

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) two years after the order for relief.

2008). *See also Perez–Sanchez v. Public Building Authority*, 531 F.3d 104, 107 (1st Cir.2008) ("Although the name of the doctrine may sound auspicious for late-filing plaintiffs, it does *not* allow a plaintiff to avoid filing suit so long as some person continues to violate his rights."); *Roemmich v. Eagle Eye Development, LLC*, 526 F.3d 343, 350 (8th Cir.2008) ("A series of wrongs is only continuous for the purposes of this doctrine ... when no single incident in a chain of tortious activity can fairly or realistically be identified as the cause of significant harm" (Internal quotation marks and citation omitted)). As the *Limestone* court explained, the doctrine is typically applied in workplace harassment cases where each offensive word or behavior, in isolation, may not be actionable, but viewed together establish a claim. *Cf. Cajigas v. Banco de Ponce*, 741 F.2d 464, 469 (1st Cir.1984) (noting in an employment discrimination context, "a court evaluating a 'continuing violation' argument must distinguish between a continuing violation and the continuing effects of a prior, yet discrete and no longer existent, discriminatory act."). Nor can a plaintiff "use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Limestone Development Corp.*, 520 F.3d at 802 (citing *Klehr*, 521 U.S. at 190, 117 S.Ct. 1984). Thus, actions within the applicable period do not revive those that lie outside of the limitations period.

**RICO Conspiracy**

▪ Section 1962(d) makes it unlawful to conspire to violate section 1962(c).

In that regard, each defendant in a RICO conspiracy case must have joined knowingly in the scheme and been involved himself, directly or indirectly, in the commission of at least two predicate offenses. *See United States v. Angiulo*,

847 F.2d 956, 964 (1st Cir.) (necessary elements of RICO conspiracy charge are (1) the existence of an enterprise, (2) that each defendant knowingly joined the enterprise, and (3) that each defendant agreed to commit, or in fact committed, two or more specified predicate crimes as part of his participation in the enterprise),

*Feinstein*, 942 F.2d at 41. Simply stated, without a viable RICO claim, there is no viable RICO conspiracy claim.

**Counts I and II–Violation of Civil RICO and RICO Conspiracy**

**23 A, B, C and D Quinsigamond Avenue**

▪ Applying the foregoing statutory and legal principles to the RICO claims asserted by the Bankruptcy Trustees compels a conclusion that the claims involving 23 A, B, C and D Quinsigamond Avenue are barred by the statute of limitations. The Bankruptcy Trustees, or perhaps it is only the trustee of Mr. Fiorillo's bankruptcy estate, seek $60,000 in damages for lost rent from August 2006 forward as well as damages relating to Mr. Fiorillo's ruined credit rating. But the harm occurred in 1999 when Mr. Fiorillo was forced to convey the property to an associate of Mr. Massad. Even if the RICO allegations somehow could be delayed until Mr. Fiorillo was aware of the pattern of racketeering, he should have known by 2004 when the pattern of bait and switch lending by Messrs. Mallegni and Massad was well established. Certainly the February 2006 meeting at which Mr. Fiorillo was threatened for his refusal to turn over the Airline Lewis Building should have made him aware of what was happening.

▪ "[A] separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr*, 521

U.S. at 190, 117 S.Ct. 1984. More importantly, for a predicate act falling within the limitations period to be actionable it "must be a new and independent act that is not merely a reaffirmation of a previous act; and ... [i]t must inflict new and accumulating injury on the plaintiff." *Pace Indus., Inc. v. Three Phoenix Corp.*, 813 F.2d 234, 238 (9th Cir.1987). *See also Dickey v. Kennedy*, 583 F.Supp.2d 183, 188–89 (D.Mass.2008) (damages arising from property illegally condemned more than four years before RICO lawsuit against former Boston housing inspector was barred by statute of limitations). Contrary to the Bankruptcy Trustees' argument, each month's lost rent at the Quinsigamond Avenue property neither started the clock anew nor constituted a new and independent action such that deprivation of rent after August 2006 might be actionable.

Mr. Massad's failure to discharge the Commerce Bank mortgage until November 2008 is also not a new and independent act that restarts the statute of limitations clock. Mr. Fiorillo knew or should have known for approximately nine years between his transfer of the Quinsigamond Avenue property to an associate of Mr. Massad and the discharge of the mortgage that Commerce Bank's mortgage remained of record. Moreover, the complaints do not state that Mr. Fiorillo was named as a mortgagee on the additional $500,000 in mortgages which Mr. Massad and his associates placed on the property and are devoid of dates on which Mr. Massad's associate first ceased paying the mortgages. Thus, the claim that Mr. Fiorillo's credit rating was ruined by Mr. Massad's actions does not survive.

Since the Bankruptcy Trustees do not allege that the Quinsigamond Avenue property was involved in any of the allegedly coerced settlements of various lawsuits, there is no basis for a claim on those grounds. Because there are no predicate acts for which the Bankruptcy Trustees can recover damages with respect to the Quinsigamond Avenue property, their claims for damages arising from a RICO conspiracy relating to this property cannot stand. Consequently, the motions to dismiss counts I and II of the complaints as they relate to the Quinsigamond Avenue property will be allowed.

### 425B Salisbury Street

 The Bankruptcy Trustees seek damages of "at least $200,000, which include the $200,000 lost profit when the RICO defendants interfered with the sale in 2009" of the 425B Salisbury Street property. The property was transferred to the Family Trust in December 2008 and thus Mr. Arcuri's commencing litigation and obtaining a preliminary injunction preventing the sale of the property by the Family Trust fall within the four year statute of limitations although the other allegations relating to this property fall outside of the limitations period.[62] Thus, the motions to dismiss as they relate to the Family Trust's claims for lost profit cannot be granted based on a statute of limitations argument. Nevertheless there is a problem with the Family Trust's claim for lost profit because the claim arises as a result of the state court injunction. Although the Bankruptcy Trustees refer to the state court action in which the injunctive relief entered as a "sham," the filing of a lawsuit, even a frivolous one or one that is merely a

---

**62.** I note that the complaints allege that the threats arising from the newspaper or magazine article about Mr. Massad occurred "[i]n late spring of 2006/ early summer 2006," outside the applicable date of August 23, 2006 for the limitations period for claims accruing to Mr. Fiorillo. The issuance of the May 2006 foreclosure notice also falls outside the statute of limitations.

"sham," without more, is not among the predicate acts listed in § 1961. Thus, assuming that the Family Trust could piggyback onto the pattern of racketeering directed at Mr. Fiorillo when only one act affected the Family Trust, that one act related to Mr. Arcuri's filing of a lawsuit and is not a RICO violation. *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088 n. 2 (11th Cir.2004) ("We also reject any potential state-law extortion or mail fraud claims as predicate acts in this case. Neither Raney's complaint nor his appellate briefs identify any Florida statute that would give rise to a federal RICO violation. Moreover, in order for a state extortion offense to qualify as a predicate act under the federal RICO statute, the conduct must be capable of being generically classified as extortionate: that is, "obtaining something of value from another with his consent induced by the wrongful use of force, fear or threats." *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409–10, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003)(quoting Model Penal Code). In light of our decision in *Pendergraft*, we doubt that the filing of a lawsuit could ever be 'wrongful' for the purposes of RICO. *See also I.S. Joseph Co. v. J. Lauritzen A/S*, 751 F.2d 265, 267–68 (8th Cir.1984) (threats to sue, even if groundless or in bad faith may be tortious under state law but do not come within the federal extortion statute.)").

As noted above, claims asserted by Mr. Baldiga as the bankruptcy trustee of Ms. Krowel's estate with respect to the 425B Salisbury Street property cannot stand.

They are precluded by the *Rooker–Feldman* doctrine and Ms. Krowel's lack of standing as she has no interest in this property.

For these reasons the defendants' motions to dismiss counts I and II of the complaints must be granted with respect to the 425B Salisbury Street property.

### 157 Shrewsbury Street

 With respect to the 157 Shrewsbury Street property, the Bankruptcy Trustees seek $156,000 in damages for usurious interest paid as a result of the October 2006 settlement and an additional amount for the costs of defending against what they describe as the illegal foreclosure proceedings prior to the October 2006 settlement.[63] The payment of the $156,000 which the complaints allege was made in exchange for Mr. Mallegni's terminating the foreclosure on this property appears therefore to have been made sometime in or after October 2006, less than four years before the commencement of Mr. Fiorillo's bankruptcy case. Thus a claim based on such payment would not be barred by the statute of limitations. While it is unclear from the complaints what costs are associated with the defense against foreclosure of this property since other properties were involved in the same action, that issue must be left for another day. Thus, the motions to dismiss counts I and II of the complaints relating to 157 Shrewsbury Street will be denied with respect to the complaint filed by Mr. Goldsmith and granted with respect to the complaint of Mr. Baldiga.[64]

---

**63.** I understand the costs of defending against the illegal foreclosure to be those costs incurred by Mr. Fiorillo in bringing a state court lawsuit involving the Shrewsbury Street property and other properties perhaps sometime in 2006 although the complaints do not state when the action was commenced. *See* Complaints at ¶ 41 and note 4.

**64.** Because Mr. Baldiga stated in the joint response to the motions to dismiss that the only RICO injuries involving his debtor, Ms. Krowel, relate to 425B Salisbury Street and 49 Old Colony Drive, his complaint obviously fails to state claims for any of the other properties.

### 88 Shrewsbury Street

The Bankruptcy Trustees seek damages for lost rent of $14,000 per month for the last four years and, as with the 157 Shrewsbury Street property, for costs of defending against the "illegal foreclosure." However, Mr. Mallegni and Mr. Norris acquired a 55% ownership interest in this property in 2004, well beyond any statute of limitations and thus, the Bankruptcy Trustees' claim at best would be limited to 45% of the monthly rent of $14,000.

With respect to that 45% interest, whether the Bankruptcy Trustees' claim survives depends upon who owned the property in October 2006 when the remaining 45%, ownership interest in the property was transferred to Mr. Mallegni. The Bankruptcy Trustees' complaints allege that "Fiorillo/SSDC" transferred the ownership interest. This imprecise allegation stands in contrast to the one in the USDC Amended Complaint which alleges that Shrewsbury Street Investment ("SSI") owned the property and that Mr. Fiorillo owned 45% of SSI. Therefore, inferring that the Bankruptcy Trustees' allegations were short-hand for the injury arising from Mr. Fiorillo's transferring his remaining ownership interest in SSI, this claim survives as being within the statute of limitations. But if SSDC owned and transferred the 45% interest in the property or the 45% interest in SSI, the claim would be barred by the statute of limitations. Furthermore, as stated previously, Mr. Baldiga, on behalf of the Krowel estate has no claim whatsoever relating to this property. Accordingly, the motion to dismiss counts I and II of the complaints must be allowed as to Mr. Baldiga and as to Mr. Goldsmith's claims only to the extent they are derived from SSDC.

### 249 Lincoln Street

The Bankruptcy Trustees seek damages for lost rental income of approximately $109,000 per year since August 2006 as well as the costs of defending against the illegal foreclosure with respect to this property. The damages are premised on the assumption that Mr. Fiorillo is the injured party. Although the Bankruptcy Trustees allege that as part of the October 2006 settlement Mr. Fiorillo was forced to permit the foreclosure of 249 Lincoln Street to proceed it appears he did not own this property[65] and consequently has no standing under RICO with respect to this property. Pleadings filed in the 2006 state court lawsuit brought by Ms. Krowel and SSDC against LBM and in SSDC's own 2006 bankruptcy case suggest that SSDC owned the property and thus would hold the claims related to 249 Lincoln Street.[66] While the complaints, or at least the Bankruptcy Trustees' opposition to the motions to dismiss, allege that the November 9, 2006 dismissal with prejudice of Ms. Krowel and SSDC's lawsuit filed in accordance with the October 2006 settlement agreement was coerced, the date of the dismissal of the lawsuit is outside the limitations period of these RICO actions and thus claims relating to this property are barred. The motions to dismiss counts I and II of the complaints relating to this property will be allowed.

### 49 Old Colony Drive

The Bankruptcy Trustees seek damages of $200,000 for the lien placed on the prop-

---

**65.** In their complaints, the Bankruptcy Trustees allege only that Mr. Fiorillo is the president of SSDC.

**66.** In their joint opposition to the motions to dismiss, the Bankruptcy Trustees acknowledge that Ms. Krowel and SSDC were the plaintiffs in the state court litigation brought to stop the foreclosure on the 249 Lincoln Street property. *See also* Confidential Settlement & Release Agreement attached as Exhibit 2 to the Bankruptcy Trustees' joint response.

erty by Mr. Arcuri and another $75,000 for the payment the Colony Trust was forced to make because it could not refinance the loan secured by this property as a result of the lien. While the complaints allege activity taken against the Colony Trust occurring within the limitations period, the claims assigned to the Bankruptcy Trustees by the Colony Trust must fail for the same reason those assigned by the Family Trust fail. The alleged harm was the result of malicious and wrongful litigation which is not a RICO violation. Thus, neither the Colony Trust nor its assignees has standing to assert a RICO claim relating to this property. Consequently the motions to dismiss counts I and II of the complaints are granted with respect to the 49 Old Colony Drive property.

**Claims Derivative of Those of Ms. Krowel**

As the complaint filed by Mr. Baldiga, Ms. Krowel's bankruptcy trustee, seeks damages only with respect to 425B Salisbury Street and 49 Old Colony Drive[67] and because his claims with respect to those properties are barred by the *Rooker–Feldman* doctrine and Ms. Krowel's lack of standing as she has no interest in either property, the complaints fail to state a claim on behalf of Ms. Krowel's estate. Thus the RICO claims asserted by Ms. Krowel's bankruptcy trustee will be dismissed.

**Counts III and IV: Breach of Contract and Implied Covenant of Good Faith and Fair Dealing**

 The Bankruptcy Trustees acknowledge in their joint response that they are asserting breach of contract claims only with respect to 157 Shrewsbury Street, 88 Lincoln Street and 249 Lincoln Street. To the extent these claims arise from the agreements to enter into mortgage loan transactions on terms that were not honored at the closings, they must fail because there is no allegation that any of those contracts were in writing as required by the statute of frauds. MASS. GEN. LAWS ch. 259, § 1. ("No action shall be brought ... upon a contract for the sale of land, tenements or hereditaments or of any interest in or concerning them ... or upon an agreement that is not to be performed within one year of the making thereof ... unless the promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged...."). "A mortgage contract is a conveyance of an interest in land." *Holt v. F.D.I.C.*, 216 B.R. 71, 77 (D.Mass.1997). *See also Warden v. Adams*, 15 Mass. 233 (1818) ("By force of our statutes regulating the transfer of real estates and for preventing frauds, no interest passes by a mere delivery of a mortgage deed, without an assignment in writing and by deed.").

 To the extent that the Bankruptcy Trustees are asserting breach of contract claims for the notes and mortgages which established loan terms that Mr. Mallegni and LBM breached by demanding and receiving sums in excess of what the relevant loan documents provided, the complaints sufficiently plead that those contracts were in writing except as to 157 Shrewsbury Street, and thus those claims are not barred by the statute of frauds.

In their joint opposition, the Bankruptcy Trustees acknowledge that their complaints do not allege the existence of a written contract with respect to the property at 157 Shrewsbury Street.[68] They

---

67. *See* Bankruptcy Trustees' joint response at footnote 11.

68. Although the complaints aver that "Fiorillo and his entities, including SSDC, entered into a number of written and oral contracts,"

ask that I infer that a written contract exists but that is precisely the type of leap of imagination that *Twombly* and *Iqbal* caution a court not to undertake. Without an enforceable contract, there can be no claim for breach of contract or of the duty of good faith and fair dealing implicit in a contract. *Christensen v. Kingston Sch. Comm.*, 360 F.Supp.2d 212, 226 (D.Mass. 2005).

In their joint response, the Bankruptcy Trustees, addressing whether their state law claims are barred by the statute of limitations,[69] assert that, with respect to the property at 88 Shrewsbury Street, the breach occurred in May 2006, an apparent reference to the issuance of the notice of foreclosure. As noted above, if this claim is asserted by Mr. Goldsmith as Mr. Fiorillo's bankruptcy trustee, it is not barred by the six year statute of limitations for contract claims.

With respect to the property at 249 Lincoln Street, the Bankruptcy Trustees argue that all relevant facts occurred after April 2005 which is also within the six year statute of limitations for claims asserted by Mr. Goldsmith as Mr. Fiorillo's bankruptcy trustee. But to the extent that this property and thus the breach of contract claims belong to non-debtor SSDC, Mr. Goldsmith's claims as SSDC's assignee may be barred by the statute of limitations. On the record before me, a plausible reading of the facts could place SSDC's

claim within the statute of limitations and thus counts III and IV as they relate to 249 Lincoln Street will not be dismissed. Therefore counts III and IV of the complaints will be dismissed as to the property at 157 Shrewsbury Street only.

### Res Judicata

Mr. Massad argues that the claims against him relating to 88 Shrewsbury Street, 157 Shrewsbury Street, 249 Lincoln Street and 425B Salisbury Street are barred because the state court issued a final judgment against Mr. Fiorillo with respect to these claims. Mr. Mallegni and LBM assert that issue and claim preclusion bar all claims arising from injuries alleged to have occurred before November 15, 2006, the date of the dismissals of the two state court actions (one by Ms. Krowel and SSDC and the other by Mr. Fiorillo) that entered as a result of the October 2006 settlement.[70]

 Federal courts must give state court judgments the *res judicata* effect that state law prescribes. *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 80–81, 104 S.Ct. 892, 895–96, 79 L.Ed.2d 56 (1984). Under Massachusetts law *res judicata* can refer either to claim preclusion or issue preclusion. *Kobrin v. Bd. of Registration in Medicine*, 444 Mass. 837, 843–44, 832 N.E.2d 628, 634 (2005).[71] "The invocation of claim preclusion requires three elements: (1) the identity or

complaints at ¶ 130, the Bankruptcy Trustees concede, at least with respect to 157 Shrewsbury Street, that the complaints do not expressly state that the contracts were in writing. *See* Bankruptcy Trustees' joint response at footnote 13.

**69.** Massachusetts imposes a six year limitations period for breach of contract actions and breaches of the covenant of good faith and fair dealing. *201 Forest Street LLC v. LBM Financial LLC (In re 201 Forest Street LLC)*, 409 B.R. 543, 592 (Bankr.D.Mass.

2009). The cause of action accrues at the time of the breach. *Callahan v. Wells Fargo & Co.*, 747 F.Supp.2d 247, 252–53 (D.Mass. 2010).

**70.** Although their memorandum refers to both issue and claim preclusion, it is clear from their discussion that Mr. Mallegni and LBM seek dismissal because of claim preclusion.

**71.** *Korn*, 83 Mass.App.Ct. at 436, 984 N.E.2d at 886. *See also* footnote 50, *supra*.

privity of the parties to the present and prior actions, (2) identity of the cause of action, and (3) prior final judgment on the merits." *Id.* at 843, 832 N.E.2d at 634. Under claim preclusion, a prior judgment against a party defendant or his privy "extinguishes ... all rights of a plaintiff to remedies against the defendant with respect to all or any part of the transaction ... out of which the complaint arose." *Boyd v. Jamaica Plain Co–Operative Bank,* 7 Mass.App.Ct. 153, 163, 386 N.E.2d 775, 781 (1979) (citations omitted). "[I]ssue preclusion prevents relitigation of an issue determined in an earlier action where the same issue arises in a later action, based on a different claim, between the same parties or their privies. Before precluding a party from relitigating an issue, a court must determine that (1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication. Additionally, the issue decided in the prior adjudication must have been essential to the earlier judgment. Issue preclusion can be used only to prevent relitigation of issues actually litigated in the prior action." *Kobrin,* 444 Mass. at 843–44, 832 N.E.2d at 634.

Here the complaints allege that the state court judgments arising out of the October 2006 settlement were coerced and thus issues that were or could have been decided in the underlying litigation should not be barred under the doctrine of *res judicata.* Agreements settling litigation are contracts and are subject to the principles governing all contracts. *In re New Seabury Co. Ltd. Partnership,* 450 F.3d 24, 33 (1st Cir.2006). "A contract signed under duress, including economic duress, is not binding under Massachusetts law...." *Happ v. Corning, Inc.,* 466 F.3d 41, 44 (1st Cir.2006). The complaint makes a plausible showing that Mr. Fiorillo's October 2006 settlement was coerced. Thus Mr. Goldsmith's complaint survives the defendants' *res judicata* argument with respect claims asserted for injuries suffered by Mr. Fiorillo. Any RICO claims arising from injuries to Ms. Krowel or SSDC are, as previously noted, outside of the statute of limitations and therefore are being dismissed on other grounds.

**Conclusion**

For the reasons set forth above, counts I and II of each complaint will be dismissed except as to the claims asserted by Jonathan Goldsmith solely in his capacity as the representative of the estate of Nicholas Fiorillo with respect to the following properties:

- 157 Shrewsbury Street and
- 88 Shrewsbury Street

Counts III and IV of Mr. Baldiga's complaint will be dismissed as to all defendants. Counts III and IV of Mr. Goldsmith's complaint will be dismissed as to Commerce Bank and Mr. Massad and as to the property at 157 Shrewsbury Street. Mr. Goldsmith will be given thirty days to file an amended complaint with respect to counts III and IV as they relate to 157 Shrewsbury Street to the extent he is able to address the deficiencies noted in this memorandum.

Separate orders will enter.